ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
        – and –
DARREN J. ROBBINS (168593)
DAVID C. WALTON (167268)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
davew@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN MAGNISALIAS, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | <u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| TESLA MOTORS, INC., ELON MUSK and DEEPAK AHUJA, | |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Tesla Motors, Inc ("Tesla" or the "Company"), as well as media reports about the Company and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**INTRODUCTION AND OVERVIEW**

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Tesla between May 10, 2013 and November 6, 2013, inclusive (the "Class Period"), against Tesla and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act"). These claims are asserted against Tesla and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

2. Tesla designs, develops, manufactures, and sells electric vehicles and electric vehicle powertrain components. The Company also provides services for the development and sale of electric powertrain systems and components to other automotive manufacturers. Tesla currently offers two vehicles for sale to customers, the Model S, which has been in production since 2012, and the Model X, which will be delivered to customers beginning in 2014. Regarding the Model S, Tesla proclaims on the homepage of its website that the Model S had "THE HIGHEST SAFETY RATING IN AMERICA," touting both its government safety test results as well as the additional testing independently performed by Tesla itself to ensure that all parts of the Model S registered a five-star safety score, even if they had previously scored lower in government tests. Tesla has also issued consistently positive statements about its ability to execute on Model S production and Model X introduction goals critically necessary for the Company's profitability in the face of declining revenues from other sources.

3. During the Class Period, defendants issued materially false and misleading statements regarding the Company's operations and its business and financial results and outlook. Defendants misled investors by failing to disclose that there was a major design defect in Tesla's lithium-ion battery pack which could ignite and cause a fire. As a result of defendants' false statements, Tesla's securities traded at artificially inflated prices during the Class Period, with its stock price reaching a high of $193.37 per share on September 30, 2013.

4. On October 2, 2013, a video was widely circulated showing a Model S's battery pack catching fire and bursting into flames on a road in Washington state. The video showed the Model S smoldering on the roadside, followed by press reports of the difficulties encountered by firefighters in battling the persistent blaze, which destroyed the car. Tesla attributed it to a collision with road debris and denied that the car's lithium-ion battery pack had ignited the fire. Tesla later admitted that the battery pack was indeed the source of the blaze after being punctured by road debris encountered during normal driving conditions.

5. The same day, Tesla had been downgraded by analyst Ben Kallo ("Kallo") of Robert W. Baird & Company ("Baird"), who pointed to significant execution risks for Tesla. In the wake of the Model S fire, additional reports were issued indicating that Tesla would need to divert substantial amounts of capital, otherwise needed for Model S production and Model X introduction, to research and development and potential redesign, and that Tesla faced the daunting prospect of a recall in the event of another fire incident.

6. As a result of this news, Tesla's shares plunged $12.05 per share to close at $180.95 per share on October 2, 2013, on high trading volume.

7. On October 28, 2013, a second Model S fire occurred in Mexico, which Tesla blamed on the car's rate of speed and its crash into a tree.

8. On this news, Tesla's shares fell $6.80 per share, closing at $162.86 per share on October 28, 2013.

9. Then, on November 5, 2013, after the market closed, Tesla released its financial results for the third quarter of 2013, by posting its Third Quarter Shareholder Letter on the Company

website. The Company's key metrics failed to meet analyst expectations, including a disappointing rate of vehicle deliveries.

10. As a result of this news, Tesla's shares fell $25.65 per share, closing at $151.16 per share on November 6, 2013, a one day decline of nearly 15% on high trading volume.

11. Subsequently, on November 7, 2013, Tesla confirmed a third Model S fire, with the car engulfed in flames and completely destroyed, similar to the October 2, 2013 blaze, which was also caused by impact with road debris during normal driving conditions.

12. Tesla shares continued to decline as a result of this news, dropping $11.39 per share, to close at $139.77 per share on November 7, 2013.

13. As a result of defendants' false statements, Tesla's publicly traded securities traded at inflated levels during the Class Period. After the above revelations, when it became apparent that many of Tesla's vehicles contained a design defect that could cause the lithium-ion battery pack to ignite and catch fire, the prices of the Company's securities fell, including the price of the Company's stock, which declined nearly 28% from its Class Period high. This drop removed the inflation from Tesla's securities prices, causing real economic loss to investors who had purchased Tesla securities during the Class Period.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

16. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Tesla is headquartered in this District and many of the acts charged herein, including the

preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

17. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

18. Plaintiff John Magnisalias acquired Tesla securities as set forth in the attached certification and has been damaged thereby.

19. Defendant Tesla designs, develops, manufactures, and sells electric vehicles and electric vehicle powertrain components. The Company also provides services for the development and sale of electric powertrain systems and components to other automotive manufacturers. Its shares trade in an efficient market on the NASDAQ under the symbol "TSLA." Tesla is headquartered at 3500 Deer Creek Road, Palo Alto, California 94304.

20. Defendant Elon Musk ("Musk") is, and at all relevant times was, the Company's Chief Executive Officer ("CEO").

21. Defendant Deepak Ahuja ("Ahuja") is, and at all relevant times was, the Company's Chief Financial Officer ("CFO") and Executive Vice President.

22. The defendants referenced above in ¶¶20-21 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements minimizing the severity of the problems with the lithium-ion battery pack catching fire, which caused Tesla's publicly traded securities to be artificially inflated during the Class Period.

23. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Tesla's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press

releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## BACKGROUND

24. Tesla designs, develops, manufactures, and sells electric vehicles and electric vehicle powertrain components, including lithium-ion batteries. Tesla also provides services for the development of electric powertrain systems and components and sells electric powertrain components to other automotive manufacturers. It markets and sells its vehicles through Tesla stores, as well as over the Internet. As of March 31, 2013, the Company operated a network of 32 stores in North America, Europe, and Asia. Tesla was founded in 2003 and is headquartered in Palo Alto, California.

25. Each quarter, Tesla generates revenues from sales of its flagship Model S and by collection of payments related to Zero Emissions Vehicle ("ZEV") credits. ZEV credits are awarded for sales of electric vehicles by numerous states, chief among them California. Tesla is able to trade its ZEVs to larger, more traditional auto manufacturers that otherwise cannot meet annual electric vehicle sales mandates of these states. Each ZEV that Tesla sells can generate thousands of dollars of revenue.

26. However, as the major auto manufacturers ramp up production of their own electric vehicles, the revenues that Tesla can generate from the generation and sale of ZEVs has begun to diminish rapidly. Thus, to maintain or grow overall revenues, in the face of declining ZEV sale revenues, Tesla needed increase the volume of Model S cars that it markets and sells.

# DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

27. On May 10, 2013, Tesla filed its Form 10-Q with the SEC for the period ended March 31, 2013. The 10-Q reported Tesla's results for the first quarter of 2013 and reported quarterly automobile sales of $555 million and net income from operations of $11.2 million. The Form 10-Q discussed the Model S, stating in part:

> In 2012, we completed the development of Model S, established our manufacturing capabilities at the Tesla Factory, launched Model S and ramped up our production rate. By the end of 2012, we had successfully increased production volume to over 400 vehicles per week and we have continued to consistently produce at or above this rate during the first quarter of 2013. We expect that this production level will allow us to achieve our goal of 21,000 Model S deliveries worldwide in 2013 and thereby significantly increase automotive sales, as compared to 2012.
>
> In our efforts to make Model S available to a wider range of customers, we commenced delivery of cars equipped with the lower priced, 60 kWh battery pack during the first quarter of 2013. At the same time, due to lower than expected demand for Model S with the 40 kWh battery pack, we announced that the 40 kWh battery pack would not be produced. Since some customers had already configured their vehicles with the 40 kWh battery pack, we offered to deliver a vehicle with a 60 kWh battery pack that would be limited to 40 kWh by on-board firmware.
>
> We have delivered over 7,500 Model S vehicles solely to customers in North America. We plan to start European deliveries of the Model S this summer and Asian deliveries later in 2013. Although we have made enhancements to our delivery process in North America and will continue to do so, we have not delivered Model S vehicles outside of North America and thus may face difficulties meeting our delivery plans in both Europe and Asia. If we are unable to ramp up deliveries in Europe and Asia and sustain a high level of weekly Model S deliveries throughout the year, our revenues and operating results could be significantly adversely affected and it would be unlikely that we would achieve our goal of 21,000 Model S deliveries worldwide in 2013.

28. On August 7, 2013, Tesla distributed its Second Quarter Shareholder Letter on the Company's website, which discussed the Model S, stating in part:

> **Outlook**
>
> While we expect production to increase from Q2, a considerable number of vehicles produced during the quarter will be in transit to European markets at the end of Q3. As a result, we plan to deliver slightly over 5,000 Model S vehicles in Q3, and remain on plan to deliver 21,000 vehicles worldwide for 2013. We expect that Q3 ASPs will rebound from the Q2 level as we deliver European Signature Series cars and demand for 85 kWh cars remains strong.

*   *   *

> Significant cost improvements were achieved as a result of execution of our roadmap including redesigning many elements of Model S for greater ease of manufacturing, economies of scale and supply chain improvements. Importantly, we were able to make nuanced improvements to the car at the same time, as reducing cost does not count if it makes a product worse.

29. The Second Quarter Shareholder Letter further discussed the Model X, stating in part:

> R&D expenses are expected to increase significantly in Q3 as we accelerate product development efforts on Model X, Model S right hand drive, and localization of Model S for international markets.

30. On August 9, 2013, Tesla filed its Form 10-Q with the SEC for the period ended June 30, 2013, which included Tesla's second quarter 2013 financial results. The 10-Q reported automobile sales of $401 million, resulting in a net loss of $30 million. The Form 10-Q discussed the Model S, stating in part:

> We have recently increased our production rate to meet our external guidance of 21,000 per year and future expected demand. In February 2012, we revealed an early prototype of the Model X crossover, a vehicle based on the Model S platform. We plan to start Model X production in late 2014. We sell our vehicles through our own sales and service network.
>
> We delivered slightly over 5,150 Model S vehicles during the three months ended June 30, 2013 an increase from slightly over 4,900 Model S vehicles for the three months ended March 31, 2013. During the three months ended June 30, 2013, we recognized total revenues of $405.1 million, an increase of $378.5 million over total revenues of $26.6 million for the three months ended June 30, 2012.

> \*       \*       \*

> In our efforts to make Model S available to a wider range of customers, we commenced delivery of cars equipped with the lower priced, 60 kWh battery pack during the first quarter of 2013. At the same time, due to lower than expected demand for Model S with the 40 kWh battery pack, we announced that the 40 kWh battery pack would not be produced. Since some customers had already configured their vehicles with the 40 kWh battery pack, we offered to deliver a vehicle with a 60 kWh battery pack that would be limited to 40 kWh by on-board firmware. During the second quarter of 2013, we delivered such vehicles to customers which had a slightly unfavorable impact on our gross margin. We have substantially completed the deliveries of these vehicles.

31. The Form 10-Q further discussed the Model X, stating in part:

> In February 2012, we revealed an early prototype of the Model X crossover as the first vehicle we intend to develop by leveraging the Model S platform. We currently plan to start production of Model X in late 2014. Our ability to develop and introduce the Model X in this timeframe and cost efficiently is dependent upon our expectations of leveraging the Model S platform.

> \*       \*       \*

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 7 -

> Our research and development expenses are expected to increase significantly in the third quarter as we accelerate product development efforts on Model X, Model S right hand drive, and localization of Model S for international markets.

32. On August 19, 2013, Tesla issued a press release entitled "Tesla Model S Achieves Best Safety Rating of Any Car Ever Tested – Sets New NHTSA Vehicle Safety Score Record," which stated in part:

> Independent testing by the National Highway Traffic Safety Administration (NHTSA) has awarded the Tesla Model S a 5-star safety rating, not just overall, but in every subcategory without exception. Approximately one percent of all cars tested by the federal government achieve 5 stars across the board. NHTSA does not publish a star rating above 5, however safety levels better than 5 stars are captured in the overall Vehicle Safety Score (VSS) provided to manufacturers, where the Model S achieved a new combined record of 5.4 stars.

33. Specifically, after asserting the Model S's scores in a variety of tests conducted by the National Highway Traffic Safety Administration ("NHTSA"), the press release represented that the Company had excessively tested the Model S to determine its weakest points and to improve them so that no part of the vehicle would score under 5 stars in a safety rating, stating in part:

> The above results do not tell the full story. It is possible to game the regulatory testing score to some degree by strengthening a car at the exact locations used by the regulatory testing machines. After verifying through internal testing that the Model S would achieve a NHTSA 5-star rating, Tesla then analyzed the Model S to determine the weakest points in the car and retested at those locations until the car achieved 5 stars no matter how the test equipment was configured.

34. Tesla claimed to have gone over the Model S with a fine tooth comb to identify its "weakest points" and did not stop testing until they had all achieved a perfect five-star score. This statement did not exclude from this assertion the Model S's undercarriage, its battery pack, or the parts of the car encasing and protecting the battery pack. Nor did it warn that, despite such analysis and testing, the Model S's battery pack was susceptible to puncture, explosion, and fire if road debris was struck during normal driving conditions.

35. The press release further made representations as to the safety and reliability of the Model S's battery pack, stating in part:

> The Model S lithium-ion battery did not catch fire at any time before, during or after the NHTSA testing. It is worth mentioning that no production Tesla lithium-ion battery has ever caught fire in the Model S or Roadster, despite several high speed impacts.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 8 -

36. In a September 14, 2013 "Tesla Motors Investor Presentation," Tesla again asserted that the Model S was the "Safest Car Ever Tested by NHTSA," with a "5 Star Across the Board NHTSA Safety Rating." The presentation did not warn that the Model S was vulnerable to a battery pack puncture during normal driving conditions that could ignite a fire that would destroy the vehicle.

37. On October 2, 2013, a video was widely circulated showing a Model S's battery pack catching fire and bursting into flames on a road in Washington state. The video showed the Model S smoldering on the roadside, followed by press reports of the difficulties encountered by firefighters in battling the persistent blaze, which destroyed the car. Tesla attributed it to a collision with road debris and denied that the car's lithium-ion battery pack had ignited the fire. Tesla later admitted that the battery pack was indeed the source of the blaze after being punctured by road debris encountered during normal driving conditions.

38. The same day, October 2, 2013, analyst Kallo of Baird downgraded Tesla to "Neutral" from "Outperform," citing a variety of "execution risk" concerns. Pointing to a potential shift in investor sentiment, Kallo questioned the Company's ability to deliver on its production and sales strategy, stating:

> "Tesla has several significant milestones over the next 18 months including continued production ramp and the introduction of the Model X. We believe solid execution on both of these fronts is already priced into the stock, and any hiccups in execution present stock price risk in the near to intermediate term."

39. As a result of this news, Tesla's shares plunged $12.05 per share to close at $180.95 per share on October 2, 2013, on high trading volume.

40. On October 3, 2013, *The New York Times* published an article entitled "Car Fire a Test for High-Flying Tesla," which stated in part:

> It's an automaker's worst nightmare: graphic video footage of one of its cars engulfed in flames after an accident.
>
> In the case of Tesla Motors, the fire that destroyed a Model S electric car on Tuesday is a stunning reality check for a company that has garnered almost unanimous praise for its battery-powered vehicles.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 9 -

The fire, on a highway exit in Kent, Wash., poses a serious challenge for Tesla and, at the same time, prompts new questions about the safety of lithium-ion batteries in electric cars.

Investors have already punished Tesla's high-flying stock. The company's shares fell sharply for a second straight day on Thursday after video of the Model S fire was featured prominently on Web sites. The shares, which have soared in the past year, closed at $173.31, about 10 percent off the high it reached earlier in the week.

But the larger issue will be how Tesla handles the intense scrutiny from the fire, including a likely investigation by federal regulators.

"Tesla was a success story where everything was going their way," said Karl Brauer, an analyst with the auto-research firm Kelley Blue Book. "The question now is, how do they deal with this adversity?"

So far, Tesla has said that the Model S in Washington hit a "large metallic object" that damaged one of the modules in its liquid-cooled battery pack, which is situated on the underside of the vehicle.

The company has yet to say whether it is considering changes to the car to prevent similar accidents.

And it may be some time before the National Highway Traffic Safety Administration weighs in on whether the Model S will be investigated.

Because of the government shutdown, there was no response on Thursday from the agency, a part of the Transportation Department.

Car fires often prompt safety investigations, like the inquiry two years ago when battery fires broke out in Chevrolet Volts after crash tests by federal regulators.

Battery experts said that the Tesla fire was bound to generate new questions about the stability of lithium-ion batteries in an automotive collision.

The batteries are prized in many advanced products for their high power and long life, but they have been a consistent source of problems across industries. Earlier this year, regulators grounded Boeing's fleet of 787 Dreamliners after the batteries caught fire, and laptop computers and cellphones using the batteries have ignited when they became overheated or damaged.

"This is why you can't just take cellphone batteries and string them together under the hood," said Donald R. Sadoway, a professor of materials chemistry at the Massachusetts Institute of Technology. "Cars are subject to different uses and abuses."

The Tesla battery pack is configured as a long, flat slab on the bottom of the car, beneath the passenger compartment and protected by reinforced metal.

Ralph J. Brodd, a battery consultant in Henderson, Nev., said the case shielding the battery might not have been strong enough to keep the impact from causing a short circuit.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 10 -

"If you have an accident that jars the battery or maybe deforms it a bit, the wiring could go, and then you would have a short," he said.

The video of the Tesla fire – which was shot by someone in a car passing the accident scene – showed the front of the vehicle in flames.

According to the Kent Fire Department incident report, the fire appeared to be concentrated in the car's engine compartment.

Initial attempts to douse the fire were unsuccessful. "The fire appeared to be extinguished, then reignited underneath the vehicle," the report said. Firefighters had to use a jack to turn the Model S on its side, and then cut a hole in the car to apply water to the burning battery.

Analysts said the seemingly routine nature of the accident made the fiery aftermath all the more frightening.

"It's a relatively innocuous occurrence to hit something in the road," Mr. Brauer said. "But in this case there's a fire, and a fire that's difficult to put out."

The Model S has received high safety ratings in government crash tests, and independent automotive publications have praised the car for its performance and safety features.

Tesla's founder, the software entrepreneur Elon Musk, has often called the Model S the safest car on the road. But for now, the Washington accident has pierced that perception.

A Tesla spokeswoman, Elizabeth Jarvis-Shean, did not comment on Thursday on whether Mr. Musk would publicly address the fire.

The person named as the driver of the car in the fire department report did not return telephone calls on Thursday. It is not known whether Tesla will replace the vehicle.

Tesla is preparing to increase production of the Model S and to introduce other electric cars. Auto experts say it is critical that the company tackle the fire issue head-on – first by working with regulators to determine a cause, and then by developing changes to the car to prevent it from happening again.

"You have to respond openly and honestly with the public, and work through this with N.H.T.S.A.," said Jason Vines, an industry consultant who was head of communications at the Ford Motor Company when its Explorer S.U.V.'s equipped with Firestone tires became prone to disastrous rollovers.

Mr. Vines said the Tesla fire was likely to generate more doubts about the performance of electric vehicles, which have been slow to catch on with American consumers.

"This could be another stake in the heart of electric vehicles," he said. "It is inevitable that some people are going to say they are just not ready to go on the road."

41. Additionally on October 3, 2013, *MIT Technology Review* published a report entitled "What the Tesla Battery Fire Means for Electric Vehicles," which stated in part:

> First, the fire illustrated once again how difficult lithium ion battery fires are to put out. Firefighters thought they had it put out, but it reignited. There are a couple of schools of thought among battery experts about why this happens. In a battery fire, the main thing that's burning is the liquid electrolyte, which burns best when it's exposed to air. One school of thought is that even in the absence of air there other oxidants within the battery that can create and sustain a fire. It's thought that the battery electrodes themselves can release oxygen, fueling the fire from within. If this is the case, all firefighters can do is to work to keep the fire from spreading and wait for the reactants to burn up.
>
> Other research suggests that this isn't the case. Instead, what might happen is that even once the fire is put out, the cells stay very hot and keep releasing more electrolyte in the form of vapor. Once firefighters turn off the water and oxygen can once more come into contact the vapor, it can reignite.
>
> It seems clear that we need to do more tests and learn the best ways to put out battery fires, especially as battery-powered cars proliferate.

42. On October 22, 2013, NHTSA announced that it was looking into the Model S fire.

43. On October 28, 2013, media outlets reported that a second Tesla Model S fire had occurred on October 18, 2013 in Merida, Mexico. Once again, a video surfaced of a Model S engulfed in flames, with sporadic explosions occurring, and photos were widely circulated.

44. On this news, Tesla's shares fell $6.80 per share, closing at $162.86 per share on October 28, 2013.

45. Then, on November 5, 2013, after the market closed, Tesla released its financial results for the third quarter of 2013, by posting the Third Quarter Shareholder Letter on its website. The Company reported revenue of $431 million, which was lower than analyst expectations of $554.33 million. Additionally, the Company disclosed that its ZEV revenues had fallen over 80% – from $51 million in the second quarter of 2013 to just $10 million in the third quarter of 2013 – Tesla reported disappointing results in the form of 5,500 deliveries and an increase in gross margins excluding ZEV credits from 14% to just 21%.

46. As a result of this news, Tesla's shares fell $25.65 per share, closing at $151.16 per share on November 6, 2013, a one day decline of nearly 15% on high trading volume.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 12 -

47. Subsequently, on November 7, 2013, Tesla confirmed a third Model S fire, with the car engulfed in flames and completely destroyed, similar to the October 2, 2013 blaze, which was also caused by impact with road debris during normal driving conditions.

48. Tesla shares continued to decline as a result of this news, dropping $11.39 per share, to close at $139.77 on November 7, 2013, and later to $122 per share by November 21, 2013.

49. As a result of defendants' false statements, Tesla's publicly traded securities traded at inflated levels during the Class Period. After the above revelations, when it became apparent that many of Tesla's vehicles contained a design defect that could cause the battery pack to ignite, the value of the Company's securities declined. The price of the Company's stock declined nearly 28% from its Class Period high. This drop removed the inflation from Tesla's securities prices, causing real economic loss to investors who had purchased Tesla securities during the Class Period.

## ADDITIONAL SCIENTER ALLEGATIONS

50. During the Class Period, the Individual Defendants had both the motive and opportunity to conduct fraud. They also had actual knowledge of the falsity of the statements they made or acted in reckless disregard of the truth or falsity of those statements. In so doing, the Individual Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Tesla securities during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

51. During the Class Period, as detailed herein, the Individual Defendants made false and misleading statements by misrepresenting the Company's business and prospects and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Tesla securities and operated as a fraud or deceit on Class Period purchasers of Tesla securities. Later, when the Individual Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the prices of Tesla securities fell precipitously, as the prior artificial inflation came out

of the prices over time. As a result of their purchases of Tesla securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

52. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) The Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's securities traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and other members of the Class purchased Tesla securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

53. At all relevant times, the markets for Tesla securities were efficient for the following reasons, among others:

(a) As a regulated issuer, Tesla filed periodic public reports with the SEC; and

(b) Tesla regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

**CLASS ACTION ALLEGATIONS**

54. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Tesla during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55. The members of the Class are so numerous that joinder of all members is impracticable. Tesla's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tesla or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

56. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

57. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

58. Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the prices of Tesla securities and the extent of and appropriate measure of damages.

59. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

60. Plaintiff incorporates all allegations in ¶¶1-59 above by reference.

61. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Tesla securities during the Class Period.

63. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tesla securities. Plaintiff and the Class would not have purchased Tesla securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Individual Defendants' misleading statements.

64. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Tesla securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

65. Plaintiff incorporates all allegations in ¶¶1-64 above by reference.

66. The Individual Defendants acted as controlling persons of Tesla within the meaning of §20(a) of the 1934 Act. By virtue of their positions with the Company, and ownership of Tesla securities, the Individual Defendants had the power and authority to cause Tesla to engage in the wrongful conduct complained of herein. Tesla controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding damages and interest;

C. Awarding plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: November 22, 2013

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS

  /s/ *Shawn A. Williams*
SHAWN A. WILLIAMS

One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

KENDALL LAW GROUP, LLP
JOE KENDALL
JAMIE J. McKEY
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

Attorneys for Plaintiff